**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 7 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOHN E. LAWTON,

      Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant-Appellee.

No. 04-1050
(D.C. No. 02-B-2219)
(D. Colo.)

---

**ORDER AND JUDGMENT** *

---

Before **HARTZ** , and **BALDOCK** , Circuit Judges, and **BRIMMER** ,** District
Judge.

---

      After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

---

\*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

\*\*     The Honorable Clarence A. Brimmer, District Judge, United States District
Court for the District of Wyoming, sitting by designation.

this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

John E. Lawton, *pro se*, appeals from the district court's affirmance of the Commissioner of the Social Security Administration's decision denying his application for supplemental security income (SSI) benefits. *See* 42 U.S.C. §§ 1381-1383c. We liberally construe Mr. Lawton's appellate briefs. *See, e.g., Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam); *Hall v. Bellmon*, 935 F.2d 1106, 1110 & n.3 (10th Cir. 1991) ("The *Haines* rule applies to all proceedings involving a pro se litigant . . . ."). Mr. Lawton argues that the administrative law judge (ALJ) (1) failed to adequately develop the medical record; (2) improperly determined Mr. Lawton's credibility; (3) failed to give proper weight to Mr. Lawton's treating physicians' opinions; (4) failed to properly consider the entire medical record; and (5) failed to accept the vocational expert's (VE) testimony that no jobs exist in the national economy that Mr. Lawton can perform. He also argues that (6) the Appeals Council erred in upholding the ALJ's decision notwithstanding Mr. Lawton's submission of further objective medical evidence demonstrating the actual severity of his medical condition, and (7) the decision is not supported by substantial evidence considering the whole record. We have jurisdiction to review this appeal under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), and we reverse.

# I. Standard of review

Our standard of review is well-settled:

> We review the agency's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. However, a decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. The agency's failure to apply correct legal standards, or show us it has done so, is also grounds for reversal. Finally, because our review is based on the record taken as a whole, we will meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking into account whatever in the record fairly detracts from its weight. However, we may neither reweigh the evidence nor substitute our discretion for that of the Commissioner.

*Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004) (quotations, citations, and alterations omitted). "Evidence is not substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians) or if it really constitutes not evidence but mere conclusion." *Frey v. Bowen,* 816 F.2d 508, 512 (10th Cir. 1987) (quotations omitted).

# II. Relevant facts

In his application for SSI benefits filed in March 1999, Mr. Lawton claimed disability as of December 5, 1998, due to chronic severe back pain, torn muscles in his left wrist, "RSI" in his left index finger, a "bad" left ankle and right big toe, and carpal tunnel syndrome in both wrists. Aple. Supp. App. at 91. His

claim was denied initially, upon reconsideration, and after a hearing before an ALJ. After taking testimony from a VE at the hearing and reviewing the medical record, the ALJ determined at step four of the five-step sequential test for evaluating disability that Mr. Lawton is unable to perform his past relevant work. *See* 29 C.F.R. § 404.1520 (setting forth five-step test), *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988). At step five, however, the ALJ determined that Mr. Lawton is still able to perform a limited range of light work that exists in significant numbers in the national economy. Aple. Supp. App. at 43.

The Appeals Council denied Mr. Lawton's request for review, making the ALJ's decision the final decision of the Commissioner. Thereafter, Mr. Lawton sought judicial review in the district court, which affirmed the Commissioner's decision. Mr. Lawton again appeals.

At the time of the hearing, Mr. Lawton was forty-four years old with a past work history as an electronics repair technician, bus driver, and book binder. He has a long history of back pain resulting from two injuries, which he testified that he self-treated for many years with alcohol and drug abuse, over-the-counter pain relievers, bed rest, and hot baths. He had no medical insurance and had not been able to afford regular medical treatment until he was accepted into a "CICP program" in 1999. *See id.* at 199, 216, 222. Mr. Lawton successfully completed a course of drug and alcohol abuse treatment in 1984. After lifting a computer

-4-

component and re-injuring his back, in December 1998 Mr. Lawton went to the emergency room for back pain, sciatica, and muscle spasms, and was prescribed flexeril (a muscle relaxant) and naprosyn (an anti-inflammatory drug). *Id.* at 224. He followed up with a physician's assistant, P.A. Zimmerman, in March-July 1999, and was then referred to, and treated by, Dr. Rainey, an osteopathic doctor. He never returned to work after December 1998.

**A. Treating physician reports.**

**1. P.A. Zimmerman's reports.** In March 1999, Mr. Lawton continued to complain of left leg numbness and sciatica and reported that he could not take narcotic drugs because of his past drug and alcohol addictions. *Id.* at 222. He also became unable to take prescribed anti-inflammatories, ibuprofen, and aspirin because of stomach and colon problems and an allergic rash. On March 3, P.A. Zimmerman noted midline back tenderness and decreased reflexes on the left side; he placed "light duty work" and "no lifting and bending" restrictions on Mr. Lawton and ordered some x-rays. *Id.* at 216, 222-23.

On April 26, 1999, P.A. Zimmerman examined Mr. Lawton and recorded that he was still having pain and tenderness with decreased reflexes. *Id.* at 216. His x-rays showed an old compression fracture at T12 and "mild degenerative changes, primarily at T12-L1." *Id.* at 217. There was apparently a separate lumbar report, *see id.*, but it does not appear in the record. In July 1999, P.A.

Zimmerman noted that Mr. Lawton complained of increasing back pain with leg numbness. He had positive straight leg raises, but "no tenderness to palpation midline of the back pain. Reflexes [were] symmetrical and equal." *Id.* at 203. P.A. Zimmerman ordered an MRI. The MRI showed decreased signal from L2-S1, consistent with dessication. *Id.* at 198. There were mild posterior disc bulges at L3-4, L4-5, and L5-S1, with effacement of the ventral thecal sac, but "no evidence of significant neural foraminal narrowing." *Id.* There were mild degenerative changes of the facets with ligamentum flavum hypertrophy contributing to mild spinal canal stenosis at L3-4 and L4-5. *Id.* P.A. Zimmerman referred Mr. Lawton to Dr. Rainey, and Mr. Lawton began treatment with Dr. Rainey in August 1999.

   **2. Dr. Rainey's reports.** In August, Dr. Rainey found "generalized tenderness over the paravertebral muscles between the intrascapular region and lumbar regions." *Id*. at 174. Mr. Lawton was unable to touch his toes by 18 inches, and had decreased sensation in his right calf. *Id.* He could "heel and toe walk satisfactorily," had +2/4 reflexes bilaterally, a +5/5 motor exam, and a negative straight-leg raising exam. *Id.* Dr. Rainey reviewed the MRI report and recommended a trial of epidural steroid injections, and Mr. Lawton received two injections in September. *Id.* at 176-86. Mr. Lawton testified that he rejected the third injection because the injections were painful and he did not gain substantial

pain relief from them. In February 2000, Mr. Lawton returned to Dr. Rainey, still complaining of significant pain in his thoracic and lumbar spine and bilateral radiculopathy. *Id.* at 226. He lacked being able to touch his toes by two feet, had -2/4 bilateral reflexes, had decreased sensation over the lateral side of his left leg, and a positive straight-leg raising exam on the left. *Id.* He was still able to heel-toe walk satisfactorily and had a +5/5 motor exam. *Id.* Dr. Rainey recommended a one-month trial of physical therapy, which Mr. Lawton participated in from February 23 to March 20, 2000. *Id.*; *see id.* at 233-44. Mr. Lawton's goals were to (1) be able to sit in a chair for 30 minutes, (2) to sleep through the night, (3) to return to working, and (4) to perform physical therapy exercises in home care. *Id.* at 233.

On March 13, the therapist noted that Mr. Lawton was "tolerating minimal amount of therex [with] overfatiguing." *Id.* at 244. On March 15, Mr. Lawton stated that his back was feeling better. He stated that he had walked to the library carrying fifteen pounds of books and walked home with twenty pounds of groceries without experiencing "additional pain from that." *Id.* at 243. At his next session two days later, however, he reported experiencing stabbing pain the day before down his left leg. *See id.*

Dr. Rainey examined him again on March 29 and noted that the physical therapy treatment helped, but that Mr. Lawton still had chronic pain and

radiculopathy in his lower extremities. *Id.* at 245. His objective signs were unchanged from the previous visit except for improvement in his bilateral reflexes and a negative straight-leg-raising exam. Dr. Rainey noted pain with palpation of Mr. Lawton's lumbar spine, and that his paravertebral muscles were in spasm. *Id.*

On March 31, 2000, Dr. Rainey filled out a disability form for Mr. Lawton, diagnosing chronic lower back pain with radiculopathy and stating that he expected Mr. Lawton's disability to be permanent. *Id.* at 227. He indicated that there had been no improvement in Mr. Lawton's physical condition with medical therapy and that it could not be improved with a prescribed course of therapy. *Id.* at 228. And he checked a box in the form stating that Mr. Lawton "has been or will be disabled to the extent [he is] unable to work at any job for a period of . . . 12 months or more due to a physical . . . impairment which is disabling." *Id.*

**3. Dr. Reishus's report.** On April 19, 1999 (before x-rays or MRIs had been taken), Dr. Reishus [1] filled out a disability form in which he noted that Mr. Lawton is "unable to sit or stand for long periods. Weakness in both legs. Has carpal tunnel syndrome both hands, L is worse" and that he has "chronic low back pain." *Id.* at 19. Dr. Reishus was unable to give a prognosis for length of

---

[1] Mr. Lawton states that Dr. Reishus is a "long-term" treating physician, Aplt. Br. at 10, but there are no medical records in the administrative record from Dr. Reishus except for his disability form. Mr. Lawton's original disability application states that Dr. Reishus was his treating physician from 1981 to 1990. Aple. Supp. App. at 94.

disability at that time, but stated that his prognosis "likely could be improved upon full evaluation and appropriate treatment, perhaps surgery." *Id.* But he limited Mr. Lawton to light work with a restriction that he had to "be able to get up and down a lot thru [sic] work shift." *Id.* at 20.

**B. Consulting physicians.**

**1. Dr. Michener's report.** In May 1999, Dr. Michener, a consultative physician hired by the Commissioner, ordered more x-rays. Mr. Lawton told her he had previously fractured a vertebrae, *see id.* at 167, 168, but she stated that she had no medical records to review. *Id.* at 168. In her exam, Dr. Michener noted decreased range of motion in Mr. Lawton's cervical, dorsolumbar, hip, ankle, shoulder, and wrist joints; a positive straight-leg sign on the left; and tenderness in his bilateral paraspinous muscles. *Id.* at 170. She also noted that he had tingling in his fingers bilaterally with tapping on his medial nerves and tenderness in his left forearm, and that he used a splint on his left wrist. *Id.* 168-70. Dr. Michener stated that Mr. Lawton should not use his left wrist for lifting. *Id.* at 171. But she concluded that he could lift 10 pounds frequently and 20 pounds occasionally, and could stand or walk for 2 hours and sit for 6 hours out of an 8-hour day. *Id.* She concluded that he should stoop only infrequently, should not push or pull, and could reach, handle, finger, and feel with only his right side. *Id.* She opined that most of his limitations were due to his left wrist and suggested

-9-

vocational rehabilitation.  After writing her report, Dr. Michener  received x-ray results interpreted by Dr. Leever, an osteopath.  Dr. Leever's report stated that Mr. Lawton only had "mild degenerative disc disease" in his lower thoracic spine and at L2-3, that he had no fractures, and that his right toe and ankle were normal.  *See id.* at 172.  Dr. Michener made no changes in her functional assessments after receiving this report.     *See id.* at 171.

    **2.  Non-examining consultation reports.**     In June 1999, Dr. Andriole, a physician from the state agency, reviewed the record and completed a residual functioning capacity ("RFC") assessment.  He concluded that Mr. Lawton retains the RFC to do medium work and rejected restrictions imposed by Dr. Michener.  Dr. Twombly, another state physician, affirmed Dr. Andriole's findings in November 1999.  The ALJ rejected both of these opinions as unsupportable in light of the entire record, and the Commissioner does not challenge the ALJ's conclusions.  *Id.* at 45.  We therefore do not consider them further.

    **C.  Re-interpretation of previous x-rays.**

    In July 2000, Mr. Lawton asked Dr. Spann, a radiologist/orthopedic surgeon, to review the x-rays taken in May 1999 and originally interpreted by Dr. Leever for consulting physician Dr. Michener.  Dr. Spann reported that the x-rays showed not only mild degenerative disc disease in the mid-to-inferior thoracic spine, but that he also saw "mild end plate irregularity and sclerosis and

minimal anterolateral osteophytes scattered throughout primarily the mid to inferior thoracic spine." *Id.* at 231. He also saw slight disc space narrowing at the L4-5 level and a "wedge deformity" that could represent an old compression fracture at L1 with disc space narrowing at L1-2. Further, he found some "prominent anterior and posterior osteophytes formations at the C5-6 level" with some disc space narrowing. *Id.* His reading of the May 1999 right great toe x-ray showed development of "minimal osteophytes," which he described as "minimal degenerative changes" in the metatarsal phalangeal joint. *Id.* at 230. Dr. Spann recommended taking dedicated cervical spine films to better evaluate Mr. Lawton's neck. Mr. Lawton submitted Dr. Spann's reports to the ALJ.

### D. Post-hearing medical evidence.

In February 2001, Mr. Lawton had an MRI of his cervical spine. Dr. Spann found a

> prominent posterolateral osteophyte right paracentrally and right laterally at the C5-6 level causing fairly high-grade neural foraminal narrowing at that level as well as causing some pressure effect on the adjacent thecal sac, and even causing very slight deformity of the right side of the cervical cord at that level.

*Id.* at 248. Dr. Spann also reported some straightening of the superior cervical spine and moderate disc-space narrowing and hypertrophic facet disease at C5-6. *Id.* at 249.

Dr. Rainey saw Mr. Lawton on March 8, 2001 for complaints of pain radiating down Mr. Lawton's left upper extremity and pain with neck motion. *Id.* at 247. He noted that Mr. Lawton "lacks touching his chin to his chest by two fingerbreadths" and lacks touching his chin to his shoulder "by three fingerbreadths" but that he "extends normally." *Id.* Sensation was decreased in the radial distribution in the left upper extremity. After reviewing his cervical MRI and noting "indentation on the cervical cord," Dr. Rainey diagnosed chronic cervical radiculopathy and recommended referral to a surgeon. *Id.*

Dr. Rainey re-examined Mr. Lawton's back on March 22, 2001. *Id.* at 246. His objective findings were the same as those found on March 29, 2000. *See id.* Dr. Rainey reviewed his former disability report, recommended evaluation to see if surgical treatment is warranted, and again opined that Mr. Lawton's "condition is permanent." *Id.* Mr. Lawton submitted these records to the Appeals Council.

**E. Mr. Lawton's testimony.**

At the July 12, 2000, hearing, Mr. Lawton testified that he has lumbar back pain all day, every day, with the severity depending upon his level of activity. Aple. Supp. App. at 272-73. He stated that, if he stays in a recliner on a vibrating heating pad, the pain is on a level of 1-2 on a scale of 1-10. The radicular left leg pain is 1-2 all the time, and it increases to a 7 if he walks too long or too fast. If he turns his torso the wrong way while walking, he loses strength in his legs and

-12-

cannot walk; if he sits upright for more than one-half hour, he also has trouble walking when he gets up because his legs and feet fall asleep and he gets stiff when sitting upright. He testified that, if he did minimal activity, he had pain in his thoracic area about 25% of the time, with level 9-10 pain about three or four times a month if he increased his activity. He has spasms in his neck muscles, and his neck pain increases if he has to "spend much time" turning his head to either side, looking or reaching up, or tilting his head downward. *Id.* at 277-78.

When he was working as an electronics repairman, Mr. Lawton's pain level was 5-9, with the pain increasing as the day went on, even though he was spending about $60/week on over-the-counter analgesics. *Id.* at 274. The more he has to sit up straight, bend, lift, or carry, the more intense his pain becomes, and he cannot take medications sufficient to relieve the pain because of his former addiction and current stomach and colon problems.

Mr. Lawton testified that he could stand from one-half hour to an hour at a time and that some walking actually helps reduce pain. He tries to walk about one-and-one-half miles several days each week to help lower his high blood pressure, but sometimes has leg pain and numbness ranging from a 3 to a 7 after the walk. He has to lie down or sit sometimes when walking and never walks more than an hour because the pain will be too great. He has difficulty picking up and finger-tip controlling objects because of his carpal tunnel syndrome and

torn left wrist muscles, especially with his left hand. He does not have the strength to do repeat arm/hand operations for more than half an hour or an hour. If he lifts and carries more than two pounds of groceries and walks home, his pain levels increase. Carrying ten pounds of groceries causes his pain levels to go to 4-5. He testified that he has tried everything he could, and that his pain levels had been better for the past year and one-half because he had "been able to minimize [his] activity." *Id.* at 284. Mr. Lawton's hearing testimony is consistent with his statements in his application.

**F. The ALJ's hypotheticals.**

In his first hypothetical to the VE, the ALJ presented the following factors: Mr. Lawton's age, education, and experience; an RFC for sedentary work[2] with lifting primarily with the right hand; ability to stand for an hour at a time up to four hours in an eight-hour day; ability to walk for an hour two times in an eight-hour day; ability to sit for 30 minutes at a time for four hours in an eight-hour day; ability to only occasionally do prolonged (defined as up to five minutes)

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a). "Most unskilled sedentary jobs require good use of both hands and the fingers; *i.e.*, bilateral manual dexterity. . . . Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." SSR 96-9p, 1996 WL 374185, *8.

flexing, extension, and turning of the head/neck; avoid ladder and scaffold climbing, crawling, concentrated exposure to extreme cold, walking on wet, slippery, rough, or uneven surfaces and heights; ability to do occasional ramp and stair climbing, stooping, kneeling, crouching, over-shoulder reaching, left-hand handling or fingering, and ability to do frequent handling and fingering with the right arm and hand. Aple. Supp. App. at 292-93. The VE testified that the limits on neck flexion would totally preclude all sedentary jobs. *Id.*

In his second hypothetical, the ALJ asked the VE to assume an RFC for light work [3] with the need to take breaks every two hours and the following additional factors: primary use of the right hand for lifting; standing, walking, and/or sitting for one hour at a time for up to four hours each; the same "occasional" limitations on climbing, cold, walking surfaces, stooping, crouching, crawling, left-hand handling and fingering and over-shoulder reaching; and an ability to frequently handle and finger with the right hand and to kneel and

---

[3]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567(b).

balance. With these abilities and limitations, the VE testified that a person could perform the jobs of cashier at the light RFC level, and order clerk at the sedentary RFC level, but he reduced the available numbers of jobs by 50% because of the need to alternate sitting and standing or walking. He also testified that such a person could perform a light job as an assembler of plastic hospital products and a sedentary job as a lampshade assembler, but both jobs would have to be reduced by 50% because of the need to alternate sitting and standing and by 75% because of limits on handling and fingering with the left hand.

In his third hypothetical, the ALJ kept all the abilities and limitations of the second hypothetical, except that he limited standing and walking to two hours out of an eight-hour day, and sitting to no more than one hour at a time for up to six hours. Aple. Supp. App. at 297. The VE testified that the change would eliminate all light level jobs that he had previously listed in the second hypothetical. *Id.*

In his fourth hypothetical, the ALJ kept all the abilities and limitations of the second hypothetical, except to limit the use of the left arm to no reaching, handling, fingering, or feeling. *Id.* at 298. The VE stated that all work would be eliminated. *Id.*

As a general question, the ALJ then asked whether jobs were available for a person who could not keep up a standard production pace on the jobs listed under

-16-

his second hypothetical. *Id.* at 300. The VE stated that the only job available using the second hypothetical with an added limitation of not being able to keep up production pace is that as a surveillance system monitor, for which 138 jobs exist in the Colorado economy. *Id.* at 300-01. In response to Mr. Lawton's questioning, the VE stated that even that job would be eliminated if there were limitations on moving the neck and head. *Id.* at 303.

## III. Analysis

### A. Consideration of physicians' medical opinions.

As discussed above, treating physician Dr. Rainey, who based his opinion in part on objective medical evidence, including x-rays and MRI reports, *see Williams*, 844 F.2d at 754-55 ("A medical finding itself is based upon more than objective test results and includes a physician's evaluation of observations and reported patient history."), issued a report concluding that Mr. Lawton is disabled. Although an ALJ is not bound by a treating physician's opinion on the ultimate issue of disability, *see* § 416.927(e)(1), and that opinion is not entitled to controlling weight on the ultimate issue, *see* SSR 96-5p, 1996 WL 374183, at *2, that opinion still must be evaluated by applying the factors provided in § 416.927(d), *id.* at *3.

> [O]pinions from any medical source on issues reserved to the
> Commissioner must never be ignored. The adjudicator is required to
> evaluate all evidence in the case record that may have a bearing on
> the determination or decision of disability, including opinions from

medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

*Id.*

Medical opinions not regarding the ultimate issue of disability, on the other hand, are defined as statements from acceptable "medical sources that reflect judgments about the nature and severity of [an individual's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." *Id.* A treating physician's medical opinion on issues that are *not* reserved to the Commissioner is entitled to controlling weight if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "consistent with other substantial evidence in the record." *Watkins v. Barnhart,* 350 F.3d 1297, 1300 (10th Cir. 2003) (quotation omitted). When reviewing the whole medical record for inconsistencies,

> [a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they 'outweigh' the treating physician's report, not the other way around. The ALJ must give specific, legitimate reasons for disregarding the treating physician's opinion that a claimant is disabled. In addition, the ALJ must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the

-18-

nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)-(6).

*Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995) (quotations and alterations omitted); *and see* § 416.927(d) (providing same factors as § 404.1527(d)).

The ALJ found that Mr. Lawton has the severe impairments of degenerative disc disease and carpal tunnel syndrome, *see* Aple. Supp. App. at 41, and that "an objective basis exists to support the symptoms alleged by [Mr. Lawton]," *id.* at 44.  But he rejected Dr. Rainey's opinion that Mr. Lawton is disabled, stating only that "there are inconsistencies in the objective evidence" and that "the evidence, when considered in its entirety, does not substantiate Dr. Rainey's opinion regarding the claimant's back impairment."  *Id.*  Except for mentioning that Mr. Lawton could successfully heel-toe walk and that the ALJ believed he had improvement in pain symptoms with epidural injections and physical therapy, however, the ALJ did not state what those inconsistencies are, or what objective medical evidence does not substantiate Dr. Rainey's conclusions.  *See* SSR 96-5P, 1996 WL 374183, at *3 (requiring ALJ to evaluate opinion regarding disability using factors found in §§ 404.1527(d) or 416.927(d) to determine extent to which

-19-

opinion is supported by the record); *Hamlin*, 365 F.3d at 1217 (reversing because "the ALJ failed to provide any sufficiently specific reasons as to why he was rejecting [the treating physician's] opinion" that the petitioner had been disabled for several years).

The ALJ's conclusion that the medical evidence indicated that Mr. Lawton "has had improvement in his pain symptoms and lessening of his symptoms with various treatment including epidural injections and physical therapy," Aple. Supp. App. at 44, was specifically contradicted by Dr. Rainey, *see id.* at 228. The ALJ pointed to no medical evidence supporting his opinion, but he did mention a single physical therapy report noting that Mr. Lawton had walked and carried groceries and books one day without experiencing additional problems. Aple. Supp. App. at 44. But that report was offset by a subsequent report noting that Mr. Lawton continued to experience stabbing pain in his legs. *Id.* at 243. The ALJ is simply "not free to substitute his own medical opinion for that of a disability claimant's treating doctors." *Hamlin,* 365 F.3d at 1221; *cf. Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("The sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity.") (further quotation omitted; alteration in original).

It appears that the ALJ must have credited Dr. Michener's opinion about capacity to sit, stand, walk, and lift because it was the only one remaining besides

-20-

Dr. Reishus's after he rejected the opinions of the state agency doctors. But the record shows that Dr. Michener's opinion was developed (1) without the benefit of MRIs or cervical x-rays, (2) without knowing that Mr. Lawton had degenerative disc disease and three bulging discs in his lumbar spine and a previously-fractured L1 vertebrae, (3) without knowing that Mr. Lawton had prominent osteophyte formations and high-grade neural foraminal narrowing at C5-6, causing a pressure effect on the adjacent thecal sac and an indentation in the cervical cord, (4) without knowing of the degenerative joint disease in Mr. Lawton's right great toe, (5) without knowing that subsequent medical treatment with epidural steroids and physical therapy, in Dr. Rainey's opinion, was unsuccessful, and (6) without any treatment history of Mr. Lawton. If the ALJ adopted Dr. Michener's medical opinions regarding Mr. Lawton's back and neck, he did not satisfy the requirement that he explain why, under these circumstances, Dr. Michener's opinion outweighed Dr. Rainey's or Dr. Reishus's. *See Goatcher*, 52 F.3d at 290 (if ALJ finds that "treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report") (quotations and alterations omitted). We conclude that the ALJ did not apply the correct legal standards in evaluating the medical opinions.

**B. Substantial evidence.**

At step five of the disability process, the burden shifts to the Commissioner to produce evidence that the claimant can perform other work. *Talbot v. Heckler*, 814 F.2d 1456, 1466 (10th Cir. 1987). If the Commissioner does not meet that burden, reversal is appropriate, *id.*, and "the claimant is entitled to benefits," *Williams*, 844 F.2d at 751. In arriving at an RFC, agency rulings require an ALJ to provide a narrative discussion describing how the evidence supports his conclusion. *See* SSR 96-8p, 1996 WL 374184, at *7. The ALJ must

> discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

*Id.* The ALJ "must also explain how any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* A function-by-function evaluation is necessary in order to arrive at an accurate RFC. *Id.* at *3-*4 ("[A] failure to first make a function-by-function assessment of the [claimant's] limitations or restrictions could result in the adjudicator overlooking some of [the claimant's] limitations or restrictions.").

Assuming that the ALJ relied on Dr. Michener's medical evaluations, the medical record does not support the Commissioner's conclusion that Mr. Lawton

is able to sit while performing light work that exists in substantial numbers in the national economy. The ALJ concluded that Mr. Lawton retained a light RFC (ability to lift no more than 20 pounds occasionally and 10 pounds frequently), with the following limitations: standing/walking for up to two hours; sitting no more than one hour at a time for up to six hours; frequent balancing, kneeling, and handling and fingering with his right upper extremity; occasional climbing, stooping, crouching, crawling, and handling and fingering with his left upper extremity and occasional bilateral over-the-shoulder reaching; avoiding climbing ladders, ropes, and scaffolds, avoiding heights, and avoiding walking on rocky or uneven surfaces; and avoiding exposure to extreme heat and cold temperatures. Aple. Supp. App. at 45.

But Dr. Michener opined that Mr. Lawton could *not* use his left extremity at all for lifting; that he should *not* push or pull with his left hand; and that he cannot handle, finger, or feel with his left hand. *Id.* at 171. Her conclusions were supported in the medical record and are consistent with Dr. Reishus's previous diagnosis of carpal tunnel syndrome (which was accepted by the ALJ), with Dr. Michener's own objective medical findings, and with the 2001 cervical x-ray and report. Dr. Michener's conclusions about Mr. Lawton's left extremity are also consistent with treating physician Dr. Rainey's confirmation of disability after noting that Mr. Lawton had pain radiating from his neck down his arms. But

-23-

the ALJ did not explain why he apparently rejected Dr. Michener's opinion about Mr. Lawton's arm and hand limitations while apparently accepting her opinion about his ability to perform light work. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."). The ALJ was not free to substitute his own opinion for Dr. Michener's. *See Hamlin,* 365 F.3d at 1221. No medical evidence supported the ALJ's conclusion that Mr. Lawton could push and pull and occasionally use his left hand for fingering and handling for an eight-hour work day. *Cf. Thompson*, 987 F.2d at 1491 ("The absence of evidence is not evidence.").

Further, Dr. Reishus opined that Mr. Lawton cannot sit for long periods, *see* Aple. Supp. App. at 165, which is consistent with the MRI reports showing bulging disks at three lumbar levels and the objective evidence of radiculopathy, but the ALJ did not state why he apparently rejected that opinion. Only Dr. Michener's statements made before the MRIs were taken support a finding that Mr. Lawton can sit for six out of eight hours, and the ALJ erred by failing to resolve the disparity between the treating and consulting physicians' opinions. *See Goatcher*, 52 F.3d at 290. The ALJ's RFC conclusions are not supported by substantial evidence; he did not specify the evidence he relied upon to support his

conclusions; and he did not explain why he did not accept the limitations reported by Mr. Lawton and his physicians. The Commissioner's decision must therefore be reversed.

### C. Credibility determination.

The ALJ made two statements concerning Mr. Lawton's pain that are not supported in the record. First, he stated that Mr. Lawton "testified that he has severe and excruciating pain in his back all the time." Aple. Supp. App. at 42. But Mr. Lawton testified that the severity of his back pain depends upon his level of activity. *Id.* at 272-73. He testified that, if he spends much of the time in a recliner on a vibrating heating pad or lying down, the pain is only a level of 1-2; if he tries to work, lift, sit upright or stand, it gets worse and becomes disabling. *Id.* at 273-76, 119-20. If the ALJ believed that Mr. Lawton exaggerated his pain because the ALJ did not correctly remember the testimony, his credibility analysis is flawed.

Second, the ALJ stated that the earliest medical evidence of Mr. Lawton's pain is March 1999. *Id.* at 43. But the medical record contains an ER report dated December 24, 1998 in which the attending doctor diagnosed "musculoskeletal back pain," noted a history of sciatica, and prescribed pain relievers. *Id.* at 224. The x-rays also show an old compression fracture at T12-

L1. *Id.* at 217, 231. And Dr. Reishus, who had apparently treated Mr. Lawton in the early 1990s, diagnosed "chronic low back pain" in his report. *Id.* at 165.

We note that the medical evidence supports Mr. Lawton's complaints of severe pain that moderates if he limits his activity, and the record shows that he has continuously pursued relief for pain, without any doctor disbelieving his claims of pain or questioning his credibility. *See* SSR 96-7p, 1996 WL 374186 at *7 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements."); *cf.* Aple. Supp. App. at 169 (Dr. Michener's report stating that "[h]e appears to put forth good effort"). The ALJ concluded that "an objective basis exists to support the symptoms alleged by [Mr. Lawton] and to this extent the undersigned finds him credible." *Id.* at 44. And the ALJ believed that Mr. Lawton's pain and limitations are so severe that he can not perform his past relevant work. But the ALJ generally rejected Mr. Lawton's complaints of disabling pain, stating that "[his] testimony is inconsistent and conflicts with other evidence of record, including his own previous statements to others." *Id.* Again, however, the ALJ did not state what those alleged inconsistencies or conflicts are, and we will not speculate or attempt

to supply an analysis for the Commissioner. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004) (holding that "ALJ's decision should have been evaluated based solely on the reasons stated in the [ALJ's] decision."); *Williams*, 844 F.2d at 755 (holding that, in the absence of clearly articulated reasoning discussing claimant's credibility, the record did not support a finding that claimant was not credible).

The ALJ also did not discuss why he did not believe Mr. Lawton's statements that he could only occasionally do prolonged (defined as up to five minutes) flexing, extension, and turning of his head and neck, which were consistent with the cervical x-rays, Dr. Spann's report, and Dr. Michener's findings of a decreased range of cervical motion. And the ALJ did not discuss why he did not believe Mr. Lawton's testimony about (1) not being able to pick up and control objects because of his carpal tunnel syndrome and torn left wrist muscles, especially with his left hand, and (2) not having the strength to do repeated arm/hand operations for more than half an hour or an hour. Again, these complaints are consistent with objective findings in the medical record, with Dr. Michener's limitations, and with the ALJ's finding that Mr. Lawton has the severe limitation of carpal tunnel syndrome.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial

evidence.  However, [f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995) (quotation and citation omitted).  The ALJ must "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible."  *Id.*  In the case before us, the ALJ's decision "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible," so his decision must be reversed on this additional basis.  *Hardman* , 362 F.3d at 679.

**D.  Appeals Council's refusal to re-evaluate decision in light of new medical evidence.**

The 2001 cervical x-ray evidence is relevant to an evaluation of whether objective medical evidence supports Mr. Lawton's allegations of pain and limitation in flexing, extending, and turning his head, and to Dr. Michener's limitations on the use of the left arm.  We cannot agree with the Appeals Council's statement that the additional medical evidence does not provide a basis for changing the ALJ's decision, since it is related to the period of disability in question.  *See Hardman*, 362 F.3d at 681 (reversing decision and remanding for further proceedings where it did not appear the Appeals Council properly

evaluated the entire record, including material and relevant new evidence); *Threet v. Barnhart,* 353 F.3d 1185, 1191-92 (10th Cir. 2003) (same).

### III. Conclusion

The Commissioner failed to meet her burden of demonstrating that Mr. Lawton retains the RFC to perform jobs that exist in significant numbers in the national economy. Indeed, the VE testified that no jobs are available to a person with the limitations found by Mr. Lawton's treating and consulting physicians. In addition, the Commissioner did not give legitimate reasons for rejecting Dr. Rainey's opinion that Mr. Lawton is disabled, Dr. Reishus's opinion that he cannot sit for long periods, and Dr. Michener's opinion that he can not use his left arm and hand for work activities. He also did not give specific reasons for finding Mr. Lawton to be only partially credible. On remand, the ALJ must consider the 2001 cervical MRI and Dr. Spann's reports in evaluating both the doctors' opinions and Mr. Lawton's credibility about not being able to repeatedly or fully turn, bend, and extend his head and neck.

The judgment of the district court is **REVERSED** and the case is **REMANDED** with instructions to remand the case to the Commissioner for further proceedings in accordance with this decision.

Entered for the Court


Clarence A. Brimmer
District Judge